Marian F. Harrison
US Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 307-02848 |
| | ) | CHAPTER 7 |
| TOM NEBEL, P.C., | ) | JUDGE HARRISON |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| EVA M. LEMEH, Trustee for the | ) | |
| Estate of Tom Nebel, P.C., | ) | ADV. NO. 307-00204A |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRISTI SCOTT, solely as Clerk and | ) | |
| Master of the Chancery Court for | ) | |
| Davidson County, Tennessee, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| EVA M. LEMEH, Trustee for the | ) | |
| Estate of Tom Nebel, P.C., | ) | ADV. NO. 307-00237A |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KRISTIN TERRY GOODE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## MEMORANDUM OPINION
---

## I. **INTRODUCTION**

This matter is before the Court upon cross motions for summary judgment filed by

the Chapter 7 Trustee for the law firm of Tom Nebel, P.C. (hereinafter "Trustee") and the

defendants collectively referred to as the "McRedmond Parties."[1]  The dispute herein

involves certain funds held by the Chancery Clerk and Master of Davidson County in which

both the McRedmond Parties and the Trustee claim an interest.  The disputed funds held by

the Chancery Clerk and Master were deposited pursuant to an order of the Chancery Court

in a shareholder derivative action tried by Tom Nebel, P.C., on behalf of the McRedmond

Parties.

The issue before the Court is whether all or part of the funds held by the Chancery

Court are property of the bankruptcy estate of Tom Nebel, P.C.  The issue is presented in the

form of two adversary proceedings. The first adversary complaint seeks, among other things,

---

[1]These defendants include Kristin Marie Terry Coode, Jan Michelle Crowell, Jeffrey Francis
Crowell, Jennifer Hause Crowell, Joseph Patrick Crowell, Julie Ann Crowell, Jill Marie Crowell
Fichtel, Graham Patrick McRedmond, Margaret Hunt McRedmond, Patrick J. McRedmond Jr. and
Evelyn M. Rodgers as Executors of the Estate of Patrick J. McRedmond, Sr., Rachel Marie Nadler,
Samuel Nathan Nadler, Sara Hollman Nadler, Jennifer Ellen McRedmond Ragsdale, Michael Anthony
Terry, Patrick Wade Terry, Robert Joseph Terry, Joanne M. Crowell, Maureen M. Foy, Patrick J.
McRedmond, Jr., Paul A. McRedmond, Carole M. Nadler, Sharon M. Pigott, and Monica
McRedmond Terry.

turnover of the funds held by the Chancery Clerk and Master to the estate, in part, because a Chancery Court order "finally" determined that Tom Nebel, P.C., was entitled to certain attorneys' fees. The second adversary complaint seeks a determination by this Court that: (1) a 1998 Retainer Agreement (defined herein) required payment of fees to Tom Nebel, P.C., for money received by the McRedmond Parties outside the Derivative Suit through a Kentucky Short-Form Merger (defined herein); and/or (2) that a 2003 Agreement (defined herein) between Tom Nebel, P.C., and the McRedmond Parties was void for lack of consideration and also should be avoided as a fraudulent transfer.

The proceedings in state court together with the dispute in this case span more than ten years. Accordingly, it is important first to examine the chain of events and proceedings which are relevant to this dispute and which are either stipulated or uncontested in the motions for summary judgment. These facts are listed in chronological order.

## II. <u>STIPULATED AND/OR UNCONTESTED FACTS</u>

The debtor (hereinafter "Tom Nebel, P.C."), is a Tennessee professional corporation that was chartered in 1997 to incorporate the law practice of Tom Nebel (hereinafter "Mr. Nebel"), an individual licensed to practice law in Tennessee since 1976. Mr. Nebel is the sole shareholder of Tom Nebel, P.C.

In 1993, certain minority shareholders of Elk Brand Manufacturing Company, a Kentucky corporation engaged in apparel manufacturing (hereinafter "Elk Brand"), retained the Nashville law firm of Sherrard & Roe, PLC (hereinafter "Sherrard") on an hourly-rate basis to commence the case styled ***Patrick J. McRedmond, et al. vs. Milano Corporation, et al.,*** Case No. 93-2368-III (hereinafter "Chancery Action" or "Derivative Suit") in the Chancery Court for Davidson County, Tennessee, Twentieth Judicial District (hereinafter "Chancery Court"), a shareholder derivative action commenced on behalf of Elk Brand on August 16, 1993. The defendants named in the Chancery Action included Milano Corporation, which owned a controlling interest in Elk Brand, Walter Marianelli, the president and a director of Elk Brand and the controlling shareholder of Milano Corporation; Andrew Marianelli, formerly the controlling shareholder of Elk Brand, the father of Walter Marianelli, and a director of Elk Brand; and David Manning and Edwin Pyle, both directors of Elk Brand (hereinafter "Chancery Defendants"). Patrick J. McRedmond, Jr., Monica McRedmond Terry, and Louis McRedmond, three of the minority shareholders of Elk Brand, were named as the plaintiffs on the complaint (hereinafter "Chancery Plaintiffs").[2]

The Chancery Court dismissed the Chancery Action on August 10, 1994. However, the Tennessee Court of Appeals reversed the dismissal on December 6, 1996, and remanded the case to the Chancery Court for further proceedings. The Chancery Plaintiffs changed

---

[2] Louis McRedmond withdrew as a named plaintiff prior to the 1998 engagement of Tom Nebel, P.C.

**4 – U.S. Bankruptcy Court, M.D. Tenn.**

their retention terms with Sherrard to a contingency fee basis to appeal the dismissal. Until January 1998, Kenneth R. Jones, Jr. (hereinafter "Mr. Jones") was the attorney principally in charge of the Chancery Action litigation for the Chancery Plaintiffs. In April 1997, Mr. Jones left Sherrard and opened his own law firm. Thereafter, Mr. Jones and his new firm continued to represent the Chancery Plaintiffs in the Derivative Suit until January 1998.

On October 1, 1997, Mr. Jones filed in the Chancery Action a motion for interim award of attorneys' fees and costs and a supporting affidavit. Thereafter, in January 1998, after Mr. Jones declined to continue to represent the Chancery Plaintiffs on a contingency basis, certain of the McRedmond Parties entered into a contingent fee agreement with Tom Nebel, P.C., which listed the "claim" for which Tom Nebel, P.C.,was being retained as the "Shareholder Derivative Action," and set forth the terms for Tom Nebel, P.C., to represent them in the Derivative Suit on behalf of Elk Brand. A copy of the 1998 Contingent Fee Retainer Agreement (hereinafter "1998 Retainer Agreement") is attached to this Memorandum Opinion as Appendix A.

In late 1998 and early 1999, the Chancery Court granted two motions for summary judgment in favor of the Chancery Defendants. The Chancery Plaintiffs appealed, and in a published opinion, *McRedmond, et al. v. Estate of Marianelli, et al.,* 46 S.W.3d 730 (Tenn. Ct. App. 2001), the Tennessee Court of Appeals affirmed in part, reversed in part, and remanded the case back to the Chancery Court a second time for further proceedings.

**5 – U.S. Bankruptcy Court, M.D. Tenn.**

On December 6, 2002, Tom Nebel, P.C., filed a second amended complaint on behalf of the Chancery Plaintiffs. The Chancery Action, tried before a jury in July 2003, resulted in a judgment for Elk Brand against Chancery Defendant Walter Marianelli, who was found liable for breach of fiduciary duty, in the amount of $6,918,252, and against Chancery Defendant David Manning, who was found liable for breach of fiduciary duty, in the amount of $23,138. Post-judgment interest at a rate of 10% per annum from July 14, 2003, was awarded until paid in full. The jury found in favor of Chancery Defendants Milano Corporation, Edwin Pyle, and Andrew Marianelli.

After the jury verdict, numerous post-trial motions were filed in the Chancery Court. The Chancery Defendants filed motions for entry of final judgment, for a stay of execution, and for an order dispensing with an appeal bond so that the Chancery Defendants could pursue an immediate appeal. The Chancery Plaintiffs filed motions for attorneys' fees and costs under the common fund doctrine and for an order directing the individual Chancery Defendants to repay to Elk Brand the amount of any attorneys' fees advanced to them by Elk Brand for defense of the Derivative Suit. By Memorandum and Order dated October 10, 2003, the Chancery Court found the jury verdict to be interlocutory pending a final ruling on the attorneys' fees motions.

Specifically, as to attorneys' fees, on August 27, 2003, Tom Nebel, P.C., filed four separate motions in the Chancery Action seeking awards of costs and expenses and

attorneys' fees, all on behalf of the Chancery Plaintiffs, as well as supporting affidavits and

briefs (hereinafter "Attorneys' Fees and Expenses Motions"):

> 1. Renewal of Plaintiffs' Motion for Interim Award of Attorneys' Fees and Costs filed October 1, 1997, which dealt with certain attorneys' fees and expenses incurred and paid to or through Sherrard, Mr. Jones, or his firm;

> 2. Plaintiffs' Motion for Additional Costs Pursuant to Tennessee Code Annotated, § 48-56-401, which dealt with expenses paid by Tom Nebel, P.C., totaling $6,988.15, for which Tom Nebel, P.C., had not been reimbursed;

> 3. Plaintiffs' Motion for Costs Pursuant to Tennessee Rules of Civil Procedure, Rule 54.04, which recapped all of the fees, costs, and expenses detailed in the two previously-described motions, and detailed almost $80,000 in additional costs and expenses that had been incurred and paid by certain of the McRedmond Parties since the engagement of Tom Nebel P.C., in January 1998; and

> 4. Plaintiffs' Motion for Award of Trial Attorneys' Fees, which sought an award of attorneys' fees in favor of Tom Nebel, P.C., equal to one-third of "the entire common fund resulting from this litigation. . . ," and that said amount "be increased to 40% of the common fund, in the event that defendant(s) appeal this matter."

On August 29, 2003, Sherrard filed its motion for an award of fees for legal services

that had not been paid at the time its engagement ended (hereinafter "Sherrard Motion"), and

Mr. Jones filed his separate motion for attorneys' fees and costs (hereinafter "Jones

Motion").

Between August 2003 and May 2004, extensive discovery and discovery litigation

were conducted with respect to the facts and supporting documentation underlying and

**7 – U.S. Bankruptcy Court, M.D. Tenn.**

supporting the attorneys' fees, costs, and expenses requested in the Attorneys' Fees and Expenses Motions and the Sherrard Motion. Commencing on May 6, 2004, the Chancery Court conducted hearings (hereinafter "Attorneys' Fees and Expenses Trial") for three days with respect to the Attorneys' Fees and Expenses Motions and the Sherrard Motion.[3]

On September 2, 2003, after the jury verdict was entered and the Attorneys' Fees and Expenses Motions were filed in the Chancery Action, Tom Nebel, P.C., filed an action to dissolve Elk Brand in Kentucky on behalf of certain of the individual McRedmond Parties (hereinafter "Kentucky Dissolution Suit"). The Kentucky Dissolution Suit was not a shareholder derivative action and was voluntarily dismissed prior to December 9, 2003.[4]

On October 31, 2003, the controlling shareholder of Elk Brand gave notice, pursuant to an automatic short-form process authorized under Kentucky law (hereinafter "Kentucky Short-Form Merger"), of his intention to merge Elk Brand into a newly-formed corporation known as Elk Brand Manufacturing Corporation of Kentucky (hereinafter "New Elk Brand"). Walter Marianelli was to be the sole shareholder of New Elk Brand. At that time, the McRedmond Parties owned in the aggregate 1676 shares of the common stock of Elk Brand.

---

[3]Mr. Jones and the Chancery Defendants compromised and settled the Jones Motion on April 19, 2004, so that matter was not litigated.

[4]The Chancellor noted in her Memorandum and Order of January 16, 2004, that the filing of the Kentucky Dissolution Suit was inconsistent with the Chancery Plaintiffs' position in the Chancery Action on behalf of Elk Brand as a going concern.

**8 – U.S. Bankruptcy Court, M.D. Tenn.**

The controlling shareholder and all other shareholders then owned 19,165 shares of common stock. In connection with the anticipated merger, the controlling shareholder employed Mercer Capital to perform a valuation of the minority shareholders' stock in Elk Brand.

On November 25, 2003, on behalf of the Chancery Plaintiffs, Tom Nebel, P.C., filed in the Chancery Action a request for an ex parte order restraining the majority shareholder from consummating the Kentucky Short-Form Merger. The Chancery Court denied the request due to inadequate notice on November 26, 2003. Tom Nebel, P.C., filed a motion to alter or amend but this was denied by Memorandum and Order entered on December 2, 2003. Tom Nebel, P.C., then filed a request for a temporary injunction to stay consummation of the Kentucky Short-Form Merger. The Chancery Court denied this request by Memorandum and Order entered on December 9, 2003. Shortly before the entry of the Memorandum and Order denying the request for a temporary injunction, the merger of Elk Brand into New Elk Brand was consummated. Incident to the Kentucky Short-Form Merger, New Elk Brand tendered to the minority shareholders $609 per share, or approximately $1.020 million in the aggregate (hereinafter "Merger Money"), as determined by Mercer Capital to be the fair value of their shares.

About the time that the McRedmond Parties received the payments for their shares in Elk Brand, Mr. Nebel advised them via Robert Nadler, an attorney (who had served as an intermediary in the lawsuit, not as attorney) and the husband of Carol McRedmond Nadler,

**9 – U.S. Bankruptcy Court, M.D. Tenn.**

that Tom Nebel, P.C., believed that the receipt of the Merger Money triggered an obligation under the 1998 Retainer Agreement to pay attorneys' fees equal to one-third of the amounts received. Tom Nebel, P.C., never tendered an invoice or statement for these attorneys' fees. Mr. Nadler did not believe an obligation to pay under the 1998 Retainer Agreement had been triggered by the receipt of the Merger Money. In December of 2003, Mr. Nadler met with a number of the McRedmond Parties to discuss Tom Nebel, P.C.'s contention. During this discussion, the McRedmond Parties acknowledged that Mr. Nebel had worked long and hard on the Derivative Suit, that the fate of the Derivative Suit was not at all certain on appeal, and that, consequently, Tom Nebel, P.C., might not receive anything if the Chancery Defendants filed and won their appeal.

Accordingly, three of the McRedmond Parties signed a new agreement with Tom Nebel, P.C., on December 17, 2003 (hereinafter "2003 Agreement") to pay one-third of the Merger Money. In return, the 2003 Agreement provided:

4. Mr. Nebel agrees that he will refund the total attorney fees paid by the plaintiffs to him or his firm if he is awarded any amounts by the courts. He agrees to the following method:

a. The first $340,328.56 (or such greater amount paid by the plaintiffs) of attorneys fees awarded to Mr. Nebel will be returned to the plaintiffs.

b. Amounts in excess of $340,328.56 (or such greater amount paid by the plaintiffs) belong solely to Mr. Nebel.

The above rules can be illustrated by example: If the Chancery Court or another court awards Mr. Nebel $650,000 he will upon receipt of the funds

**10 – U.S. Bankruptcy Court, M.D. Tenn.**

from Elk Brand or others refund $340,328.56 to the plaintiffs. The excess, $309,367.14, will belong to Mr. Nebel. If the Chancery Court or another court awards Mr. Nebel less than $340,328.56, for example $250,000, the entire $250,000 will be refunded to the plaintiffs.

The 2003 Agreement is attached hereto as Appendix B. After the 2003 Agreement was signed, the McRedmond Parties paid a total of $340,330.11 to Tom Nebel, P.C. The 1998 Retainer Agreement and the 2003 Agreement are the only written agreements between Tom Nebel, P.C., and the McRedmond Parties.


In accordance with applicable Kentucky statutes, some of the McRedmond Parties timely dissented from the controlling shareholder's determination of the value of their Elk Brand stock. Thereafter, New Elk Brand filed its Petition for Declaratory Judgment and Determination of Fair Value of Shares in the Circuit Court of Jefferson County, Kentucky (hereinafter "Kentucky Valuation Suit"). Named as defendants were certain of the McRedmond Parties. This action was brought for the purpose of determining the merits of the McRedmond Parties' dissent from the valuation placed by the controlling shareholder on their shares of Elk Brand. Tom Nebel, P.C., represented the McRedmond Parties in the early stages of the Kentucky Valuation Suit, but by order entered August 20, 2004, New Elk Brand's motion to disqualify Tom Nebel, P.C., was granted. After Tom Nebel, P.C.'s disqualification, the defendants in the Kentucky Valuation Suit, which is presently pending, have been represented by other Tennessee and Kentucky attorneys.


**11 – U.S. Bankruptcy Court, M.D. Tenn.**

Following the consummation of the Kentucky Short-Form Merger, the Chancery Defendants moved to dismiss all the claims of the Chancery Plaintiffs, including their claims for attorneys' fees and costs, on the ground (among others) that the merger mooted such claims. By Memorandum and Order entered January 16, 2004, the Chancery Court granted the motion as to the $6.9 million, but denied the motion as to the requests for attorneys' fees and costs.

By Memorandum and Order entered March 8, 2004, the Chancery Court ruled on disputes that had arisen in the course of discovery preparatory to an evidentiary hearing on the requests for awards of attorneys' fees and expenses. Among other things, the Chancery Court ruled that despite the failure of Tom Nebel, P.C., to keep contemporaneous time records during the course of the litigation, the claim for fees and expenses would not be forfeited because to do so would unjustly enrich New Elk Brand and the majority shareholder.

On April 30, 2004, the Chancery Court entered a Memorandum and Order specifying the procedure for the evidentiary hearing on the requests for awards of attorneys' fees and expenses.

About the time of the filing of Mr. Nebel's Affidavit on May 3, 2004, on behalf of the McRedmond Parties, Bill Terry, who is the husband of Monica McRedmond Terry (one of

**12 – U.S. Bankruptcy Court, M.D. Tenn.**

the McRedmond Parties and Chancery Plaintiffs), paid some of the Derivative Suit expenses included in the total of $32,372.97. During early June 2004, Mr. Terry conferred with Tom Nebel, P.C., concerning these direct payments. This resulted in an agreement that the actual un-reimbursed amount due Tom Nebel, P.C., at that time was $19,700. The McRedmond Parties thereupon paid Tom Nebel, P.C., by two separate checks dated June 4, 2004, and June 10, 2004, totaling $19,700. Since June 2004, Tom Nebel, P.C., has incurred no material cost or expense incident to its representation of the McRedmond Parties.

Beginning May 6, 2004, the Chancery Court conducted hearings for three days on the above-described Attorneys' Fees and Expenses Motions and the Sherrard Motion. After the Attorneys' Fees and Expenses Trial, the Chancery Court entered a Memorandum and Order, dated June 1, 2004, which awarded attorneys' fees and costs utilizing the common fund doctrine (hereinafter "June 1, 2004, Memorandum and Order"). In the order, the Chancery Court awarded "$1,967,078.33 to the Law Offices of Tom Nebel as recovery on its attorneys fee application in this case."

The Chancery Defendants sought to appeal the award of attorneys' fees. On June 30, 2004, the Chancery Court required that, to stay execution of the June 1, 2004, Memorandum and Order, New Elk Brand must post a bond equal to all attorneys' fees and costs awarded ($335,810.00 + $1,764,190.00 + $202,888.33 = $2,302,888.33), plus interest thereon at the statutory judgment rate of 10% per annum for a period of three years. On July 28, 2004, to

stay the execution of the June 1, 2004, Memorandum and Order, certain of the Chancery Defendants and New Elk Brand posted with the Chancery Clerk and Master a cash appeal bond in the original amount of $2,993,754.82 which named as beneficiaries: "the appellees Patrick J. McRedmond, Jr.; Monica McRedmond Terry; Sherrard & Roe, PLC; the Law Offices Of Tom Nebel, P.C." The cash appeal bond was approved by the Chancellor.

During the appeal process, two additional attorneys, John I. Harris, III, (hereinafter "Mr. Harris") and Suzette Peyton (hereinafter "Ms. Peyton"), filed motions to have their attorney liens recognized and enforced by the Chancery Court. On June 15, 2004, Mr. Harris, a licensed attorney formerly affiliated with Tom Nebel, P.C., filed a motion to have his lien recognized and to be paid for services he rendered the Chancery Plaintiffs while he was in the Nebel Office. On February 1, 2006, Ms. Peyton filed a notice of her lien for work on behalf of the Chancery Plaintiffs' Derivative Suit, and on March 24, 2006, filed a motion to enforce her lien.

By order entered December 7, 2004, the Chancery Court awarded Mr. Harris the sum of $90,000 as compensation for his work on the Derivative Suit, and further ordered that said sum *"be deducted from and to come out of the $1,764,190 fee awarded to the Law Firm of Tom Nebel."* (Emphasis added.) After a hearing that was conducted while the main case was on appeal, the Chancery Court entered an order, dated April 18, 2006, declaring an attorney's charging lien for Ms. Peyton in the amount of $184,958.90 plus interest, again *"to*

**14 – U.S. Bankruptcy Court, M.D. Tenn.**

**be deducted from the fee awarded to The Law Offices of Tom Nebel P.C."** (Emphasis added.)

The Chancery Defendants' appeals of the June 1, 2004, Memorandum and Order and their appeals from the jury verdict were consolidated in the Tennessee Court of Appeals. By its opinion of September 29, 2006, the Tennessee Court of Appeals affirmed the June 1, 2004, Memorandum and Order and the jury verdict. **See McRedmond v. Estate of Marianelli**, No. M2004-01496-COA-R3-CV, 2006 WL 2805158 (Tenn. Ct. App. Sept. 29, 2006). Thereafter, the Chancery Defendants filed a petition for rehearing, which was denied on November 21, 2006. On January 18, 2007, the Chancery Defendants filed applications for permission to appeal in the Tennessee Supreme Court. By order entered March 12, 2007, the Tennessee Supreme Court denied the Chancery Defendants' applications for permission to appeal.

Following the appeal process but **before** Tom Nebel, P.C., filed its petition in bankruptcy (April 25, 2007), a variety of matters were filed in the Chancery Court relating to the Chancellor's June 1, 2004, Memorandum and Order. The Chancery Defendants filed a notice of their intent to enter into two separate settlement agreements, to wit: one involving the Chancery Defendants and Sherrard, the other involving the Chancery Defendants, Tom Nebel, P.C., and Sherrard. On March 28, 2007, the Chancery Court indicated a willingness to approve the first agreement with Sherrard but gave Mr. Harris an opportunity to object.

**15 – U.S. Bankruptcy Court, M.D. Tenn.**

As to the second agreement, the Chancery Court ordered further work to be done by the parties. Specifically, the Chancery Court stated: (1) "[t]he settlement agreement with the law firm of Sherrard and Roe has implications for no person or entity beyond those involved in the settlement agreement;" (2) "[t]he settlement agreement with the Nebel Firm has implications for persons and entities not parties to the lawsuit," including Mr. Harris' and Ms. Peyton's attorneys' fees liens; and (3) "[a]dditionally, the individual plaintiffs who filed the lawsuit on behalf of the corporation contend that they are owed from the Nebel Firm $600,000 they advanced in expenses during the litigation."

On April 2, 2007, the Chancellor entered an Agreed Order providing that money from the appeal bond should be immediately disbursed to Ms. Peyton, Mr. Harris, and Elk Brand. As to the remaining funds, the Chancellor ordered that they continue to be held by the Chancery Clerk and Master pending further orders of the court concerning reimbursement to the remaining fund beneficiaries, the Chancery Plaintiffs, and Tom Nebel, P.C.

On April 4, 2007, the Chancery Plaintiffs filed a motion in Chancery Court requesting the entry of an order:

> (i) modifying the Fee Order to increase the award of costs and expenses to $238,037.80; (ii) specifying that the award of costs and expenses, as modified, and the award of attorneys fees to the extent of $340,328.56, plus interest attributable to said sums, equitably belong to the [Chancery Plaintiffs]; (iii) directing the Clerk and Master to disburse to the [Chancery Plaintiffs] the aforesaid sum of $578,366.36, plus interest thereon from July 14, 2003, from the funds now remaining on deposit with the Clerk & Master in this cause; and

**16 – U.S. Bankruptcy Court, M.D. Tenn.**

(iv) granting Movants such other and further relief to which they may show themselves to be entitled.

Prior to this motion being heard, Tom Nebel, P.C., filed its petition for bankruptcy protection on April 25, 2007. On that same date, the Chancery Clerk and Master was holding over $2,196,376.23 of the appeal bond.

On May 11, 2007, the Trustee filed with the Chancery Court a Motion for an Order Directing Disbursement of Funds Held by the Chancery Clerk and Master (hereinafter "Disbursement Motion"). Some of the McRedmond Parties had actual notice of the filing of Tom Nebel, P.C.'s bankruptcy within a few days after the filing of the Disbursement Motion. On May 21, 2007, the Chancery Plaintiffs filed their response to the Disbursement Motion. The Disbursement Motion was originally set by the Trustee to be heard on May 25, 2007, in the Chancery Court. Shortly before the hearing date, the Trustee removed the Disbursement Motion from the docket to afford time for the parties to try to reach an agreed order.

On June 13, 2007, counsel for certain of the McRedmond Parties forwarded a proposed conditional agreed order for submission to the Chancery Court that provided for disbursement, upon certain conditions, of proceeds above $930,000. The parties failed to reach an agreement concerning disposition of the Disbursement Motion.

Thereafter, on June 19, 2007, the Trustee filed her first complaint seeking the turnover of the funds held by the Chancery Clerk and Master as property of the estate, in part, because the June 1, 2004, Memorandum and Order awarded attorneys' fees to Tom Nebel, P.C.

On June 26, 2007, this Court directed the Chancery Clerk and Master to remit to the Trustee all funds then held from the appeal bond in excess of $930,000. In compliance with this order, the Chancery Clerk and Master remitted the sum of $1,301,010.44 to the Trustee on July 13, 2007. The Chancery Clerk and Master continues to hold at least $930,000.00 of the appeal bond.

On July 18, 2007, the Trustee filed her second complaint seeking a determination that the 1998 Retainer Agreement required the payment of fees to Tom Nebel, P.C., for the Kentucy Short-Form Merger and the avoidance of the 2003 Agreement between Tom Nebel, P.C., and the Chancery Plaintiffs as fraudulent pursuant to 11 U.S.C. § 544 and T.C.A. §§ 66-3-305 and -306.

On June 27, 2007, the McRedmond Parties filed an abstention motion, which was denied by this Court on December 26, 2007. The parties then filed cross motions for summary judgment which are presently before this Court.

**18 – U.S. Bankruptcy Court, M.D. Tenn.**

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c), as incorporated by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

### IV.  ARGUMENTS

The Trustee contends that Tom Nebel, P.C., and thus its estate has the sole ownership interest in the appeal bond funds currently held by the Chancery Clerk and Master.  In support of her claim, the Trustee argues that the Chancery Court's June 1, 2004, Memorandum and Order is final and that the appeal bond funds protect only the award of fees to Tom Nebel, P.C., thereby precluding any claim of interest by the McRedmond Parties.  Alternatively, the Trustee argues that the appeal bond funds currently held by the Chancery Clerk and Master are payable to Tom Nebel, P.C., under the 1998 Retainer Agreement, and that the 2003 Agreement is void for lack of consideration and voidable as a fraudulent transfer.

The McRedmond Parties seek summary judgment, asserting that pursuant to the 1998 Retainer Agreement, Tom Nebel, P.C., has no interest in any expenses awarded in the June 1, 2004, Memorandum and Order and that the expense award should be corrected to

$238,037.80.  In addition, the McRedmond Parties contend that they have a superior interest

to Tom Nebel, P.C., in the appeal bond funds to the extent necessary to make them whole

for fees and expenses paid by them to Tom Nebel, P.C., under the 1998 and 2003

Agreements.


## V.  THE CHANCELLOR'S JUNE 1, 2004, MEMORANDUM AND ORDER IS NOT PRECLUSIVE

The Trustee argues that the Chancellor's June 1, 2004, Memorandum and Order

awarding attorneys' fees and expenses was a "final" order and, therefore, was preclusive of

the relative interests of Tom Nebel, P.C., and the McRedmond Parties in the appeal bond

held by the Chancery Clerk and Master.  The burden of proof to establish preclusion is on

the Trustee, and she has not carried her burden in her motion for summary judgment, nor can

she do so in this case as a matter of law.


In Tennessee, judgments are treated like any other written instruments – the question

is always the intention of the Court.  *Livingston v. Livingston,* 58 Tenn. App. 271, 281, 429

S.W.2d 452, 456 (1967) (citation omitted).  A judgment must be construed not only with

reference to the four corners of the instrument, but also in light of the pleadings, particularly

the prayer of the complaint, *Vanatta v. Vanatta,* 701 S.W.2d 824, 826 (Tenn. Ct. App. 1985)

(citations omitted), and "the apparent purposes in the minds of the draftsman and the court."

*Hale v. Hale*, 838 S.W. 2d 206, 209 (Tenn. Ct. App. 1992) (citation omitted).  *Accord State*

**20 – U.S. Bankruptcy Court, M.D. Tenn.**

***v. Phillips,*** 138 S.W.3d 224, 229 (Tenn. Ct. App. 2003) ("[a]scertaining the trial court's intention is the principal goal").

The pleadings filed prior to the Chancellor's June 1, 2004, Memorandum and Order offer the first glimpse of what she was resolving in June 2004. From the very beginning, first with Sherrard and then with Tom Nebel, P.C., all requests for attorneys' fees were made on behalf of the Chancery Plaintiffs. In the June 1, 2004, Memorandum and Order itself, the Chancellor spent all but approximately two pages examining the Chancery Plaintiffs' claims against the Chancery Defendants for fees under Kentucky's common fund doctrine, which she had applied in her earlier orders. As explained in the Chancellor's January 16, 2004, order, the common fund doctrine provides an incentive to shareholders to retain an attorney to prosecute meritorious causes of action on behalf of corporations.[5] When a lawsuit is filed under the common fund doctrine and the court awards fees, such fees are awarded to spread the costs of the litigation among all beneficiaries, the primary beneficiaries being those who served as plaintiffs and advanced funds therefore. ***See Geier v. Sundquist,*** 372 F.3d 784, 790 (6th Cir. 2004) (citing ***Boeing Co. v. Van Gemert,*** 444 U.S. 472, 478 (1980)). In its pleadings, Tom Nebel, P.C., requested fees and expenses on behalf of the Chancery Plaintiffs, recognizing that any such awards would inure to the Chancery Plaintiffs' benefit.

---

[5]Referencing the affidavit of Donald Carl Langevoort, the Lee S. & Charles A. Speir professor of law at Vanderbilt University School of Law.

**21 – U.S. Bankruptcy Court, M.D. Tenn.**

The June 1, 2004, Memorandum and Order is filled with the Chancellor's effort to resolve the attorneys' fee dispute between the Chancery Defendants and the Chancery Plaintiffs. Tom Nebel, P.C., and the Chancery Plaintiffs were clearly on the same side in their opposition to the Chancery Defendants' objections. The June 1, 2004, Memorandum and Order contains no hint of a dispute between the Chancery Plaintiffs and Tom Nebel, P.C., nor is there any discussion of their respective rights. In contrast, Sherrard, which was no longer representing the Chancery Plaintiffs, asked for and received a liquidation of its request for fees in the amount of $335,810. The remainder of the fee award ($1,967,078.33), the Chancellor awarded to Tom Nebel, P.C. Subsequent Chancery Court orders demonstrate that this award was merely a calculation of the total amount of fees to which the Chancery Plaintiffs and their various counsel were entitled.

These subsequent Chancery Court orders clearly demonstrate that the Chancellor never intended for the June 1, 2004, fee award to be a final adjudication of what Tom Nebel, P.C., was entitled to receive from the Chancery Defendants. The multiple beneficiaries on the Chancery Defendants' appeal bond approved by the Chancellor included the Chancery Plaintiffs as well as Tom Nebel, P.C. Following later filings by Mr. Harris and Ms. Peyton to establish their attorneys' liens, the Chancellor, in separate orders, awarded both fees *to be deducted and paid from the fee awarded to Tom Nebel, P.C., on June 1, 2004.*

Finally, the Chancellor rejected the second proffered settlement regarding fees on March 28, 2007, because it implicated in part the Chancery Plaintiffs' claim that they were owed money they previously advanced ($600,000) to Tom Nebel, P.C., during the Derivative Suit.  On April 2, 2007, the Chancellor ordered distribution of the portions of the appeal bond to the other attorneys and required that the remainder of the appeal bond be held by the Chancery Clerk and Master pending further orders as to the dispute between the remaining beneficiaries, the Chancery Plaintiffs and Tom Nebel, P.C.  Clearly, the Chancellor never intended that the June 1, 2004, Memorandum and Order would preclude the Chancery Plaintiffs' interest in the appeal bond, and she reserved that issue on March 28, 2007, before the Tom Nebel, P.C., bankruptcy petition was filed on April 25, 2007.

Not only did the Chancellor not consider the June 1, 2004, Memorandum and Order preclusive to the interests of the McRedmond Parties; it was not and could not be preclusive. Preclusion is usually stated in the form of res judicata or collateral estoppel or more recently, claim preclusion or issue preclusion.[6]  The Trustee has not mentioned these doctrines in her

---

[6] Res judicata or claim preclusion "bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been raised in the former suit." *State ex rel. Cihlar v. Crawford,* 39 S.W.3d 172, 178 (Tenn. Ct. App. 2000). Collateral estoppel or issue preclusion bars the same parties or their privies from relitigating in a second suit issues that were actually raised and determined in the former suit. *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn.1987); *Cihlar*, 39 S.W.3d at 178-79.

Preclusion in federal litigation following a judgment in state court depends on the Full Faith and Credit Statute, 28 U.S.C. § 1738, which requires the federal court to give the judgment the same effect as the rendering state would. *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985). When the state judgment would not preclude litigation in state court of an issue that turns

**23 – U.S. Bankruptcy Court, M.D. Tenn.**

complaint or in her argument, and for good reason.  The June 1, 2004, Memorandum and Order supports neither claims nor issue preclusion as to the McRedmond Parties' interests in the fees awarded or in the appeal bond.

First, as to claims preclusion, the claims in the Chancery Action dealt with by the Chancellor in the June 1, 2004, Memorandum and Order were quite different than the claims that the McRedmond Parties have with respect to attorneys' fees and the appeal bond.  In 2004, the proceedings dealt with claims made against the Chancery Defendants on behalf of the Chancery Plaintiffs, not the McRedmond Parties' claims against Tom Nebel, P.C. Second, as to issue preclusion, the Trustee has not and cannot meet her burden to demonstrate that the issue raised by the McRedmond Parties here was actually litigated and decided in the June 1, 2004, Memorandum and Order and that it was actually necessary to the judgment.  Nowhere in the June 1, 2004, Memorandum and Order does the Chancellor mention the dispute between the Chancery Plaintiffs and Tom Nebel, P.C., and it was certainly not decided there.  Instead, the Chancellor noted that the dispute was alive and well in her Memorandum and Order of March 28, 2007.

---

out to be important to a federal case, the federal court may proceed; otherwise not. ***Harris Trust & Sav. Bank v. Ellis***, 810 F.2d 700, 704-06 (7th Cir. 1987).

Case 3:07-ap-00204    Doc 129    Filed 03/16/09    Entered 03/16/09 11:23:06    Desc Main
Document      Page 24 of 48

To raise this issue for the Chancellor in 2004, Tom Nebel, P.C., would have had to give the McRedmond Parties notice that he intended to claim all of the fees and expenses regardless of what fees and expenses the McRedmond Parties had paid. Something of this nature is required under Tennessee law to assert and enforce an attorney's lien, much as Mr. Harris and Ms. Peyton filed notice of their liens and later requested distribution of their part of the appeal bond. *See Schmitt v. Smith,* 118 S.W.3d 348, 353 (Tenn. 2003) ("so long as adequate notice of the lien is provided to the public and to future purchasers, the requirements of Tennessee Code Annotated sections 23-2-102 and 23-2-103 are satisfied"). *But see Starks v. Browning,* 20 S.W.3d 645, 651 (Tenn. Ct. App. 1999) (notice requirement has less importance in disputes solely between attorney and client, which was not the case in June 2004).

It is thus clear that the Chancellor's June 1, 2004, Memorandum and Order was not a final one so as to preclude the McRedmond Parties from claiming an interest in the appeal bond funds still held by the Chancery Clerk and Master. Such funds constitute an express trust for the beneficiaries. *In re Elrod,* 42 B.R. 468, 472-74 (Bankr. E.D. Tenn. 1984), *Carter Baron Drilling v. Excel Energy Corp.,* 76 B.R. 172, 174 (Bankr. D. Colo. 1987) (cash deposited "in the court pending appeal is *in custodia legis*, and may be considered the res of a trust"). Neither Tom Nebel, P.C., nor the McRedmond Parties held legal title to the funds at the time Tom Nebel, P.C., filed its Chapter 7 petition, nor do they now. At most, until their relative interests are determined here, they have a contingent interest in the funds

pending an order to distribute the appeal bond, which was not made by the Chancellor and which now falls to this Court. Moreover, the Trustee has no more interest in the funds than Tom Nebel, P.C. *See French v. Johnson (In re Coomer),* 375 B.R. 800, 804 (Bankr. N.D. Ohio 2007) (citation omitted) (to extent an interest in property is limited in hands of debtor, it is then equally limited in hands of Chapter 7 Trustee).

Having determined that the Chancellor's orders do not finally resolve the dispute between the Trustee and the McRedmond Parties, we must now turn to an analysis of the contractual relationship between Tom Nebel, P.C., and the McRedmond Parties.

## VI.  THE CONTRACTUAL RELATIONSHIP BETWEEN TOM NEBEL, P.C., AND THE McREDMOND PARTIES

Because the relationship between an attorney and client is a contractual one in Tennessee, *Alexander v. Inman,* 974 S.W.2d 689, 694 (Tenn. 1998); *Starks v. Browning,* 20 S.W.3d 645, 650 (Tenn. Ct. App. 1999), this Court must now look to the 1998 and 2003 Agreements between Tom Nebel, P.C., and the McRedmond Parties (Appendices A and B) and to Tennessee law regarding attorney-client contracts.

### A.  The Trustee's Complaint

Counts I and II of the Trustee's second complaint allege (1) that the 2003 Agreement (Appendix B) is void for lack of consideration, and (2) that the 2003 Agreement must be

Case 3:07-ap-00204   Doc 129   Filed 03/16/09   Entered 03/16/09 11:23:06   Desc Main
Document    Page 26 of 48

avoided pursuant to Tennessee's version of the Uniform Fraudulent Conveyance Act, T.C.A. §§ 66-3-301, *et seq.,* because Tom Nebel, P.C., received no new value for his promises under that agreement. Both counts are founded upon the Trustee's claim that the McRedmond Parties' receipt of payment in exchange for their shares in December 2003 pursuant to the Kentucky Short-Form Merger was a "Recovery" under Paragraph 3 of the 1998 Retainer Agreement (Appendix A) entitling Tom Nebel, P.C., to a fee of $340,328.56 because the merger was somehow "caused" by the Derivative Suit. That is, the $340,328.56 paid to Tom Nebel, P.C., by the McRedmond Parties after they signed[7] the 2003 Agreement was already earned by Tom Nebel, P.C., under the 1998 Retainer Agreement.

### B.  Tennessee Law Regarding the Interpretation of Contracts Between Attorney and Client

Both the McRedmond Parties and the Trustee  agree that the 1998 Retainer Agreement is clear, and each argues respectively that extrinsic evidence in the form of the declarations of Mr. Nadler and Mr. Nebel cannot be used to deviate from the clear provisions of the 1998 Retainer Agreement.  However, the Trustee and the McRedmond Parties do not agree on the "clear" meaning of the 1998 Retainer Agreement.  The McRedmond Parties contend that the 1998 Retainer Agreement covers only recoveries from the Derivative Suit. The Trustee argues that the 1998 Retainer Agreement gives Tom Nebel, P.C., fees for any

---

[7]The 2003 Agreement was only signed by three of the McRedmond Parties.

recovery whether or not within the rubric of the Derivative Suit, including for example, money received for their shares through the Kentucky Short-Form Merger.

Before examining explicitly the 1998 and 2003 Agreements, the Court must first look to Tennessee law regarding the interpretation of contracts and, in particular, attorney-client contracts.

The interpretation of a contract in Tennessee is a question of law for the court, and the court's primary job is to determine what the parties intended in entering into the contract. *Silva v. Buckley,* No. M2002-00045-COA-R3-CV, 2003 WL 23099681, at *2 (Tenn. Ct. App. Dec. 31, 2003). Parties may not use parole or extrinsic evidence to vary the clear terms of a contract. *Bradford v. Sell,* 240 S.W.3d 834, 838 (Tenn. Ct. App. 2007) (citations omitted). However, even if a contact is clear on its face, "'the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms.'" *Burlison v. United States,* 533 F.3d 419, 430 (6th Cir. 2008) (quoting *Silva v. Buckley,* at *2). Just because parties to a contract disagree about its clear meaning does not mean the contract is ambiguous. *Warren v. Metro. Gov't of Nashville & Davidson County,* 955 S.W.2d 618, 623 (Tenn. Ct. App. 1997).

Finally, Tennessee courts permit the admission of extrinsic evidence if it is useful in resolving latent ambiguities in a contract:

> A latent ambiguity exists where: "the equivocality of expression, or obscurity of intention, does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases made use of."

*Burlison v. United States,* 533 F.2d 419, 430 (quoting *Mitchell v. Chance*, 149 S.W.3d 40, 44 (Tenn. Ct. App. 2004)).

Attorney-client contracts add another layer of rules which pose a heavy burden on the attorney (and now the Trustee) seeking to support his interpretation of the agreement with his clients. This additional burden results from the important fiduciary relationship between an attorney and his client. An attorney owes the client the "utmost good faith" in their dealings. *Silva v. Buckley,* 2003 WL 23099681, at *2 (citing *Alexander v. Inman,* 974 S.W.2d 689, 694).

As recognized by Tennessee cases, in order to enforce a contract with a client (or to accept the attorney's interpretation of the contract), an attorney has the burden to show:

    (1)    that he or she provided the client with the same information and advice that the attorney would have provided the client had he or she not been personally involved in the transaction;

    (2)    that the client fully understood the meaning and effect of the contract;

(3)     that the client's understanding of the contract was the same as the attorney's; and

(4)     that the contract is just and reasonable.

*Alexander v. Inman,* 903 S.W.2d 686, 694 (Tenn. Ct. App. 1995). At a minimum "the client must fully understand the contract's meaning and effect. If the agreement is clear and unambiguous [in favor of the attorney's interpretation] the burden [shifts to] the client to show that the client did not have the same understanding as the attorney." *Silva v. Buckley*, at *3 (citation omitted).

## C.  The 1998 Retainer Agreement

It is undisputed that the 1998 Retainer Agreement prepared by Tom Nebel, P.C., was a purely contingent fee agreement drafted long before the December 2003 forced merger was on the horizon. Further, it is undisputed that in executing the 1998 Retainer Agreement, neither the McRedmond Parties nor Tom Nebel, P.C., contemplated a later forced sale of Elk Brand shares; indeed, at that time, the only thing in sight was the Derivative Suit before the Chancery Court.

The 1998 Retainer Agreement confirms that it is a fee agreement between the parties for representation in the Derivative Suit. Indeed, it is titled "Contingent Fee Retainer Agreement," it lists the McRedmond Parties as clients, and describes the "*Claim*" as the "*Shareholder Derivative Action*." (Appendix A) (emphasis added).

**30 – U.S. Bankruptcy Court, M.D. Tenn.**

The Trustee argues that regardless of whether the parties had in mind only the Derivative Suit when they executed the 1998 Retainer Agreement, the language in Section 3 of that agreement covers any recovery or benefit procured by Tom Nebel, P.C., on the McRedmond Parties' behalf. This argument ignores not only the claim set forth under the title of the contract, it also ignores other clear language:

> Recovery . . . includes but is not limited to any and all quantifiable benefits, whether tangible or intangible, including but not limited to, payments or compensation of any nature whatsoever to Clients *in settlement of this case* and/or any benefits *resulting from judgment being entered in favor of Clients.* [Emphasis added.]

Further, the contract reads: "[i]f this litigation is settled or a verdict is reached [in the Derivative Suit] in favor of the corporation, Tom Nebel, P.C. will petition the Court for an award of attorney's fees . . . ." Further, "Tom Nebel, P.C. shall not be liable for costs and expenses . . . in connection with the prosecution of *this claim.*" (Emphasis added.)

From the document itself, the conclusion is inescapable and clear that the 1998 Retainer Agreement deals *only* with Tom Nebel, P.C.'s representation in the Derivative Suit. Monies received by the McRedmond Parties from the forced merger and sale of their shares clearly do not fall within the contract. First, in 2003, when the Merger Money was received, the Derivative Suit was still going strong, with years of appeals to follow. Second, Tom Nebel, P.C., could not apply for fees from the merger in the Chancery Court as contemplated by the 1998 Retainer Agreement because the only claim before the Chancery Court was the

Derivative Suit. Third, the sale proceeds from the Kentucky Short-Form Merger were not benefits or recoveries in any sense – the McRedmond Parties never wanted their shares converted to cash, they did not like the price paid, and they and Tom Nebel, P.C., did everything they could to oppose the merger.[8]

Indeed, Tom Nebel, P.C., had nothing whatsoever to do with the Merger Money. The Trustee has not and cannot show that the Derivative Suit "caused" the merger and the receipt by the McRedmond Parties of the unwanted cash for their shares. The merger was automatic under Kentucky law, Tom Nebel, P.C., did everything it could do to stop it, and the McRedmond Parties were forced to hire other Kentucky counsel to represent their interest in it.

In sum, the Kentucky Short-Form Merger was clearly outside the scope of the 1998 Retainer Agreement, and Tom Nebel, P.C., was due no fee from the merger under that agreement.

---

[8]On November 25, 2003, on behalf of the Chancery Plaintiffs, Tom Nebel, P.C., filed in the Derivative Suit a request for an ex parte order restraining the majority shareholder from consummating the Kentucky Short-Form Merger. The Chancery Court denied the ex parte request due to inadequate notice. Tom Nebel, P.C., then filed a motion to alter or amend the ex parte denial order, which the Chancellor also denied on December 2, 2003. Tom Nebel, P.C., then filed in the Derivative Suit a request for temporary injunction to stay consummation of the Kentucky Short-Form Merger, which the Chancellor denied on December 9, 2003.

**32 – U.S. Bankruptcy Court, M.D. Tenn.**

## D.   The "Stipulation" in the 2003 Agreement

In addition to asserting that the 1998 Retainer Agreement is clear in its application to the Merger Money, the Trustee argues that by entering into the 2003 Agreement (Appendix B) (signed by only three of the McRedmond Parties), the McRedmond Parties "stipulated" that the 1998 Retainer Agreement required the payment of a fee to Tom Nebel, P.C., on account of the receipt of the Merger Money by all shareholders.   The 2003 Agreement does begin with the language: "The parties will pay Mr. Nebel 1/3 of the amounts received [from the merger] as required by their contract for the performance of legal services."

The Court assumes first that this language does not violate the parole evidence rule even though it appears to deviate from the clear language of the 1998 Retainer Agreement, because it may relate to "the construction placed on the agreement by the parties in carrying out its terms."   *Bratton v. Bratton,* 136 S.W.3d 595, 602 (Tenn. 2004) (citation omitted). Even with this assumption, the Trustee has not carried nor can she carry her heavy burden mandated by the nature of the attorney-client contract under Tennessee law.   The Trustee has not and cannot do so because the undisputed facts show that Tom Nebel, P.C., and the McRedmond Parties did not share the same interpretation of the 1998 Retainer Agreement and this language in the 2003 Agreement.

This inquiry must, of necessity, look to facts outside the contracts themselves relative to the parties' understanding. The declaration of Robert Nadler offered to demonstrate the McRedmond Parties' understanding states that when Mr. Nebel broached the subject of a fee for the Merger Money in 2003 under the 1998 Retainer Agreement, Mr. Nadler and the McRedmond Parties did not understand the 1998 Retainer Agreement to require such a payment, because it was clearly not contemplated when they signed the 1998 Retainer Agreement. Rather, because they recognized that Tom Nebel, P.C., had worked long and hard on the Derivative Suit on their behalf for which there was no end in sight, they agreed to modify the 1998 Retainer Agreement to guarantee and pay Tom Nebel, P.C., *at least* $340,328.56 (one-third of the Merger Money) regardless of whether they recovered any money in the Chancery Action. As shown above, the 1998 Retainer Agreement entitled Tom Nebel, P.C., only to a contingent fee. In return, Tom Nebel, P.C., agreed to continue to seek fees in the Chancery Action, and the McRedmond Parties would be entitled to the first $340,328.56 in awarded attorneys' fees so that they would be made whole for fees and expenses they had already paid. Accordingly, the McRedmond Parties certainly did not read the "stipulation" to deviate from the clear meaning of the 1998 Retainer Agreement.

Rather than contravening the 1998 Retainer Agreement, the McRedmond Parties' understanding is consistent with it. Under their interpretation, in exchange for a guaranteed payment of $340,328.56 from the Merger Money, that money was simply "deemed" to have been paid under the 1998 Retainer Agreement. In essence then, the language signaled the

modification of the 1998 Retainer Agreement. Such reading comports not only with the clear intent of the 1998 Retainer Agreement along with the McRedmond Parties' understanding as related by Mr. Nadler, it is also supported by the very fact that Tom Nebel, P.C., did not receive the $340,328.56 until after the 2003 Agreement was discussed and signed by certain of the McRedmond Parties.

The Trustee has simply provided nothing to the Court in her motion for summary judgment to dispute that the McRedmond Parties had a different and reasonable understanding of the contracts. When questioned before the Chancery Court and again in his deposition in this case, Mr. Nebel actually appears in agreement with the McRedmond Parties' understanding.

During a hearing in Chancery Court held on May 6, 2004, Mr. Nebel testified that "my first obligation is to pursue a fee here, and my clients do not owe me a third of anything they get on the valuation of the stock plus a fee as awarded by this Court. I do not get both."

In his deposition, taken on May 23, 2007, Mr. Nebel similarly testified as follows:

**Q:** Now, I think you testified earlier that if you were not in bankruptcy and the PC were not in bankruptcy and you received a check from the Clerk and Master for the funds that are on deposit over there, one of the things you would do is write a check to the clients for the expense award, and you would also write a check to the clients for the 340,000-odd-dollars that they paid you back in December of '03.

**35 – U.S. Bankruptcy Court, M.D. Tenn.**

**A.**    Correct.

. . . .

**Q:**    That's right.  We established earlier that the entire $340,000 round numbers again of fees that were paid in December '03 went into the PC's account, and if the – if the PC now receives the full amount of the fees that were awarded June 1 of  '04, 1,764,190 and the PC retains both of those sums, it will have been double paid to the extent of $340,000.  That would be true, wouldn't it?

**A.**    Yes.

More recently, in his declaration submitted in support of the Trustee's motion for summary judgment, Mr. Nebel has changed his tune regarding the $340,328.56 paid to him in December 2003.  Mr. Nebel is trying to "clarify" what he said twice before.  Now his declaration states that the intent of the 1998 Retainer Agreement was to grant two fees, one for the Derivative Suit and one for the money received for the then non-existent merger:

6.        The intent of the 1998 Retainer Agreement was to grant a contingency fee to Nebel PC for each and every separate "recovery" obtained either on behalf of Elk Brand in the Derivative Suit, or obtained by or on behalf of the individual McRedmond Parties as a result of a favorable outcome in the Derivative Suit.

7.        . . .  As agreed compensation for Nebel PC's services in connection with the Derivative Suit, Nebel PC was awarded a one-third contingency fee pursuant to the terms of the 1998 Retainer Agreement.

8.        A second and distinct recovery was obtained by or on behalf of the individual McRedmond Parties as a result of the favorable outcome in the Derivative Suit when the McRedmond Parties received $1.020 million from the Kentucky short-form merger . . . of Elk Brand.

**36 – U.S. Bankruptcy Court, M.D. Tenn.**

9.         Nebel PC's work resulted in two separate recoveries, one for Elk
          Brand and a second for the individual McRedmond Parties, and Nebel
          PC was entitled to a contingency fee for each.

          . . . .

11.        The First Recovery contingency fee has been awarded (though
          not yet paid) only once.  It was awarded by the Chancery Court in
          connection with the Derivative Suit.

12.        The Second Recovery contingency fee has been paid only once.
          It was paid by the individual McRedmond Parties.

13.        The 1998 Retainer Agreement required the individual
          McRedmond Parties to pay the Second Recovery contingency fee
          directly because there was no legal basis upon which to shift that fee
          to any other party.

While changing, rather than "clarifying," his own testimony about his understanding

of the 1998 Retainer Agreement, Mr. Nebel's dubious declaration does nothing to change

the McRedmond Parties' understanding of their obligations and has no relevance thereto.[9]

---

[9]Not only does Mr. Nebel's declaration construct a new agreement to pay two contingent fees
out of whole cloth, it also does more than that.  For summary judgment, "a party cannot create a
disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition
testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.,* 448 F.3d 899, 906 (6th Cir. 2006).  *See Penny
v. United Parcel Serv.,* 128 F.3d 408, 415 (6th Cir. 1997) (plaintiff's affidavit not considered "because
a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary
judgment has been made, that essentially contradicts his earlier deposition testimony") (citation
omitted).  If Mr. Nebel's declaration was relevant to the task at hand, the Court would consider
excluding it as a sham affidavit full of legal conclusions.  Instead, it is merely irrelevant because it
adds nothing to show that the McRedmond Parties had the same understanding of the 1998 and 2003
Agreements.

It should also be noted here that the Trustee's objection to evidence offered by the
McRedmond Parties showing Mr. Nebel's recent disbarment is sustained pursuant to Federal Rule
of Evidence 404(b).

**37 – U.S. Bankruptcy Court, M.D. Tenn.**

The Trustee cannot stand on this new interpretation of the 1998 Retainer Agreement under Tennessee law relating to attorney-client contracts.

### E.  Consideration for Mr. Nebel's Signing of the 2003 Agreement (The Fraudulent Conveyance Claim)

The Court has already held that Tom Nebel, P.C., was not entitled to a fee for the Merger Money under the 1998 Retainer Agreement, and that the 1998 Retainer Agreement was purely contingent.  In return for the $340,328.56 and the promise that Mr. Nebel would retain that fee regardless of the outcome in the Derivative Suit, Mr. Nebel renewed his promises that the McRedmond Parties would be made whole from the first $340,328.56 in fees awarded in the Chancery Court.  Thus, there was ample consideration for the 2003 Agreement.

In addition, Mr. Nebel should not be permitted to claim, regardless of the language in the 2003 Agreement, that there was no consideration for his promises there.  As an attorney, he had an obligation to his clients to provide them the same information about the contract as he would have provided them if he had no interest in the matter.  *Silva v. Buckley,* 2003 WL 23099681, at *2 (citing *Alexander v. Inman,* 903 S.W.2d 686, 694).  Mr. Nebel has never testified that he told his clients there was no consideration for their paying him the $340,328.56 together with their guarantee that he could keep that money even if they ultimately lost the Derivative Suit.

**38 – U.S. Bankruptcy Court, M.D. Tenn.**

Under the undisputed facts of this case, together with Tennessee contract law, it is clear that there was consideration for Tom Nebel, P.C.'s entry into the 2003 Agreement, and that new value was given for Tom Nebel, P.C.'s promises therein, thereby defeating any fraudulent conveyance action.

## VII.  ANY LITIGATION EXPENSES PAID BY THE McREDMOND PARTIES MUST ALSO BE REIMBURSED BY THE APPEAL BOND

It is undisputed that as of June 2004, around the time that the Chancellor entered her initial fee award, the McRedmond Parties had paid directly or reimbursed Tom Nebel, P.C., for all litigation expenses incurred to date.  It is also undisputed that since June 2004, Tom Nebel, P.C., incurred no material cost or expenses incident to its representation of the McRedmond Parties.  It is further undisputed that to date, the McRedmond Parties have not been made whole with respect to the Derivative Suit litigation expenses just as they have not been made whole with respect to the $340,328.56.

Section 4 of the 1998 Retainer Agreement provides for the clients to pay expenses, for Tom Nebel, P.C., to be reimbursed for any such expense it pays, and clearly, as a result, to make whole the McRedmond Parties for any expenses awarded by the Chancery Court unless Tom Nebel, P.C., has some outstanding unencumbered expenses.  Accordingly, under

the circumstances, Tom Nebel, P.C., has no claim on the appeal bond funds for any litigation expenses paid on behalf of the McRedmond Parties.[10]

Since Tom Nebel, P.C., has already been reimbursed by the McRedmond Parties for any expenses he has incurred, payment to Tom Nebel, P.C., for expenses from the appeal bond funds would amount to more than double recovery for Tom Nebel, P.C., since it did not pay most of these expenses and since, to the extent it paid them, it had already been reimbursed.

The only real argument the Trustee makes against the distribution of the expense funds from the appeal bond to the Tom Nebel, P.C., estate is again that the Chancery Court entered a "final order" on June 1, 2004, awarding expenses and costs to Tom Nebel, P.C. This argument, we have seen, does not preclude the McRedmond Parties' claim to those funds.

Accordingly, along with fees, the McRedmond Parties are entitled to a distribution from the appeal bond for litigation expenses they have paid. The Court reserves the question of the proposed "correction" to the amount of the expenses to a future time.

---

[10]In addition, most of the litigation expenses were actually incurred and paid while Sherrard was representing the McRedmond Parties.

**40 – U.S. Bankruptcy Court, M.D. Tenn.**

## VIII.  THE McREDMOND PARTIES HAVE ESTABLISHED THEIR LEGAL RIGHTS TO A PORTION OF THE APPEAL BOND NOW HELD IN THE CHANCERY COURT

From all of the foregoing, it is apparent that the McRedmond Parties have made their case on this record that they are entitled as a matter of law to certain proceeds from the appeal bond funds for fees and expenses they have paid.  Had this matter continued in Chancery Court, the Chancellor would have made just such a disbursement of funds under the applicable contracts once she considered the McRedmond Parties' claims reserved by her in the April 2, 2007, order.

## IX.  CONCLUSION

Accordingly, the Trustee's motion for summary judgment should be denied, and the McRedmond Parties' motion for summary judgment should be granted in part, there being no dispute in this record as to the McRedmond Parties' entitlement to certain fees and expenses from the appeal bond funds now held by the Chancery Clerk and Master.

Counsel for the McRedmond Parties will prepare an order denying the Trustee's motion for summary judgment and granting the McRedmond Parties partial summary judgment on the issues resolved herein.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

**41 – U.S. Bankruptcy Court, M.D. Tenn.**

**APPENDIX A**



The Law Offices of
## Tom Nebel, P.C.
Trial Attorneys

### Contingent Fee Retainer Agreement

**CLIENTS:**   Patrick J. M<sup>c</sup>Redmond, Jr., Monica M<sup>c</sup>Redmond Terry, Carole M. Nadler, Paul M<sup>c</sup>Redmond, Maureen M<sup>c</sup>Redmond Foy, Sharon M<sup>c</sup>Redmond Pigott, and Joanne M<sup>c</sup>Redmond Crowell on behalf of Elk Brand Manufacturing Company.

**ATTORNEY:**   Tom Nebel

**CLAIM:**   SHAREHOLDER DERIVATIVE ACTION

1.    **Matter Involved.** The Clients retain Tom Nebel, P.C. (Trial Attorneys) to represent them, on behalf of the Elk Brand Manufacturing Company in a shareholder derivative action arising from the conduct of the majority shareholder and other directors.

2.    **Clients Functions.** The Client agrees to perform the following functions:

    A)    To pay Tom Nebel, P.C. for the performance of legal services and to pay for all expenses incurred in connection therewith, as specified in the below paragraphs.

    B)    To cooperate fully with Tom Nebel, P.C. and to provide all information known by or available to the clients which may aid the attorney in representing the clients in this matter.

3.    **Legal Fees.** The clients agree to compensate Tom Nebel, P.C. for representation herein as follows:

_____  A)    25% of any and all recovery to the Clients in the event the case is settled more than 90 days before the first scheduled trial date, even if the case is later rescheduled for another date.

_____  B)    33⅓ of any and all recovery to the Clients in the event the case is settled 90 days or less before the first scheduled trial date or in the event the case is tried but not appealed.

    C)    40% of any and all recovery to the Clients in the event of appeal after a trial on the merits. This 40% fee shall be triggered by the filing of a notice of appeal.

Tom Nebel, P.C. agrees to petition the Court for an award of attorney's fees, and to the extent fees are awarded, Clients shall be credited for any fees recovered pursuant to the Order of the Court. If the Clients recover and the Court awarded fees fail to fully compensate Tom Nebel, P.C. as provided herein, the remaining obligations hereunder will be the responsibility of the Clients.

Recovery or recover includes but is not limited to any and all quantifiable benefits, whether tangible or intangible, including but not limited to, payments or compensation of any nature whatsoever to Clients in settlement of this case and/or any benefits resulting from judgment being entered in favor of Clients.



FILED
JUL - 1 2005
Clerk of the Courts
Rec'd By_____



EXHIBIT # _13_
FILE DATE _5-6-04_
CASE # _93-2368_
BY: _____

Exhibit: _3_
Wit: _Nobel_
Date: _5/23/07_
Rptr:

If an interim award of attorney's fees is made by the Court and the Court does not allocate the award of fees between Tom Nebel, P.C. and any other attorneys who before execution of this agreement have represented Clients, then Clients and Tom Nebel, P.C. shall attempt to agree on the division of the interim award.

It is expressly understood between the Clients and Tom Nebel, P.C. that this derivative action was brought for the benefit of Elk Brand. If this litigation is settled or a verdict is reached in favor of the corporation, Tom Nebel, P.C. will petition the Court for an award of attorney's fees. Tom Nebel, P.C. will first attempt to collect all attorney's fees due from Elk Brand. The Clients will not incur any debt or liability to Tom Nebel, P.C. for attorney's fees unless as a result of a settlement or a judgment, an award of cash or other benefit is realized by the individual Clients. If no funds or other benefits are paid to or realized by the Clients, Tom Nebel, P.C. will not seek payment from the Client's for attorney's fees. Tom Nebel, P.C. retains all legal remedies for the collection of attorney's fees against Elk Brand and the defendants.

4.      Expenses. Tom Nebel, P.C. shall not be liable for costs and expenses of any kind and shall be reimbursed by Clients for necessary expenses in connection with the prosecution of this claim. Such expenses may include charges made by court reporters, expert witnesses, investigators, and electronic research as billed to Tom Nebel, P.C. and . Additionally, Client agrees to reimburse Attorney for all expenses including, but not limited to charges for depositions, transcripts, witness fees, photocopy expenses, long distance phone calls, and travel expenses.

Attorneys are authorized to pay from any settlement or judgment obtained on Clients' behalf any of Clients' unpaid costs and/or expenses incurred by Tom Nebel, P.C.

5.      Other Firm Personnel. Tom Nebel, P.C. shall make use of legal assistants in the preparation of this litigation, and the legal assistant will, during portions of this claim, be the principal contact with the firm for questions, copies of documents, etc.

6.      Termination of Agreement. Tom Nebel, P.C. may withdraw from this matter if Clients fail to honor the agreement, or if after investigation Tom Nebel, P.C. determines available evidence is insufficient to warrant further representation. Upon withdrawal, Client shall be responsible for reimbursing all costs and expenses advanced by Tom Nebel, P.C.

By evidence of the signatures of Clients below, each UNDERSTANDS and AGREES to the terms of this Agreement and hereby acknowledges receipt of a copy of same.

_Patrick J. M°Redmond, Jr._
Patrick J. M°Redmond, Jr.

_Monica M°Redmond Terry_ 1-13-98
Monica M°Redmond Terry

_Carole M. Nadler_ 1-10-98
Carole M. Nadler

2

*Paul McRedmond* 1-15-98
Paul McRedmond

*Maureen McRedmond Foy*
Maureen McRedmond Foy

*Sharon McRedmond Pigott*
Sharon McRedmond Pigott  1.14.98

*Joanne McRedmond Crowell*
Joanne McRedmond Crowell  Jan. 15, '98

Tom Nebel, P.C.

_____

Attorney

3

**APPENDIX B**

## Agreement

The minority shareholders of Elk Brand engaged Tom Nebel, attorney, to represent Elk Brand Corporation in derivative litigation. Following a jury trial in June/July 2003, the jury awarded Elk Brand a $6.9 million award against Walter Marianelli for violation of his fiduciary duties. Following the trial, Elk Brand under the control of Mr. Marianelli employed the Kentucky short form merger statute and caused the minority shareholders to tender their stock for a fair value price. As of this date, the minority shareholders have been paid 609.18 per share. The derivative litigation continues and litigation in Kentucky over the fair value price may be required. The parties agree to the following:

1. The parties will pay Mr. Nebel 1/3 of the amounts received as required by their contract for the performance of legal services. This is $203.06 per share. The total payment at this time will be $340,328.56. Each shareholder will bear his own share of the legal fees.

2. No additional fees will be payable by the plaintiffs unless and until they receive additional amounts from the fair price controversy related to the short term merger, or another source such as settlement or Court awarded sums collected by the Plaintiffs.

3. Mr. Nebel agrees that he will file all claims against Elk Brand and others for attorneys fees and costs in all appropriate courts that arose out of the $6.9 jury award in the Chancery Court. He further agrees to prosecute these claims to the fullest degree possible.

4. Mr. Nebel agrees that he will refund the total attorney fees paid by the plaintiffs to him or his firm if he is awarded any amounts by the courts. He agrees to the following method:

    a. The first $340,328.56 (or such greater amount paid by the plaintiffs) of attorneys fees awarded to Mr. Nebel will be returned to the plaintiffs.

    b. Amounts in excess of $340,328.56 (or such greater amount paid by the plaintiffs) belong solely to Mr. Nebel.

The above rules can be illustrated by example: If the Chancery Court or another court awards Mr. Nebel $650,000, he will upon receipt of the funds from Elk Brand or others refund $340,328.56 to the plaintiffs. The excess, $309,367.14, will belong to Mr. Nebel. If the Chancery Court or another court awards Mr. Nebel less than $340,328.56, for example $250,000, the entire $250,000 will be refunded to the plaintiffs.

5. Mr. Nebel agrees to represent plaintiffs in respect to attorneys fees claimed by Sherrard and Roe and by Ken Jones. He further agrees to present our claims for attorney fees and costs, which amount to over $300,000, in a manner that protects our interests.



Exhibit:
Wit: _Nebel_
Date: 5/23/07
Rptr:

6. Mr. Nebel agrees to make a claim on behalf of Elk Brand for the recovery of attorney fees paid to the directors and Milano.

_G. Thomas Nebel_

12/17/03
Date

Derivative Shareholders

_Joanne M. Crowell_

_[signature]_

_Joseph P. Crowell_

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.